

08 CV 02396

James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
Telefax: (212) 385-9010
E-mail: jim.hohenstein@hklaw.com
        lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
Atlas Shipping A/S



RECEIVED
MAR 07 2008
U.S.D.C. S.D N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATLAS SHIPPING A/S,<br><br>               Plaintiff,<br><br>        -against-<br><br>SHIPPING-LAND CO. LTD.,<br><br>           Defendant. | 08 Civ.    (   )<br><br>**VERIFIED COMPLAINT** |



Plaintiff, Atlas Shipping A/S ("Atlas"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against defendant, Shipping-Land Co. Ltd. ("Shipping-Land"), alleges, upon information and belief, as follows:

1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.     At all times material herein, plaintiff Atlas was and is a business entity organized and existing under the laws of Denmark and maintains its principal place of business at Sundkaj 11, "Frihavnen", DK-2100 Copenhagen Ø, Denmark.

3.     Upon information and belief, at all times material herein, Shipping-Land was and is a foreign entity organized and existing under the laws of a foreign nation with a principal place of business at 9th Floor, Donghwa Building 58-7 Seosomun-dong, Chung-ku, Seoul, 100-736, Korea (South).

4.     On or about September 19, 2007, Shipping-Land as disponent owner[1] of the IKAN MANZANILLO (the "Vessel") and Atlas as charterer entered into a time charter party pursuant to a NYPE form charter party with logical amendments, dated September 19, 2007 ("Time Charter"). A true and correct copy of the Time Charter is attached hereto as Exhibit 1.

5.     The Time Charter called for delivery of the Vessel in New York and set the hire rate at US$ 43,000 per day including overtime, to be paid 15 days in advance. Exhibit 1.

6.     The Vessel was delivered by Shipping-Land to Atlas for service under the Time Charter on October 7, 2007.

7.     On or about February 14, 2008 Atlas and Shipping-Land entered into Addendum No.1 to the Time Charter in order to allow Atlas to exercise the option of extending the maximum period of performance of the Time Charter to May 20, 2008 with all other terms of the Time Charter remaining in full force and effect ("Addendum No.1"). A true and correct copy of

---

[1] A disponent owner is the person or entity who controls the commercial operation of a vessel and is responsible for deciding ports of call and the cargoes to be carried. Very often the disponent owner is not the registered owner having title to the vessel but a party who has previously chartered the vessel from the registered owner or another charterer. PETER BRODIE, DICTIONARY OF SHIPPING TERMS (4th Ed. 2003).

2

Addendum No.1 is attached hereto as Exhibit 2. In reliance on the addendum, Atlas sought and found further employment for the Vessel.

8.    On February 20, 2008 16:42 hours, the Vessel was re-delivered to Atlas by a sub-charterer at Mobile, Alabama.

9.    After executing Addendum No.1 with Shipping-Land, Atlas entered into another sub-charter party with the registered owner of the Vessel, dated February 21, 2008, whereby delivery to the sub-charterer was agreed to be within the period of Febraury 23, 2008, 22:00 hours to February 25, 2008, 24:00 hours. Delivery of the Vessel under this contract was to be at the Southwest Pass, Mississippi River. The purpose of this sub-charter was to allow Atlas to position the Vessel for its subsequent employment.

10.    However, on February 23, 2008 at 16:58 hours, the registered owner of the Vessel withdrew the Vessel from Shipping-Land and thus Shipping-Land was in anticipatory repudiation of the Time Charter and Addendum No.1 with Atlas.

11.    As a result of Shipping-Land's breach of the Time Charter and Addendum No.1, Atlas suffered damages for which Shipping-Land is liable.

12.    Atlas made a 15-day advance hire payment to Shipping-Land covering the period from February 19, 2008, 05:00 hours to March 5, 2008, 05:00 hours. This payment is reflected on Atlas' Hire Statement Recap, dated February 29, 2008. A true and correct copy of the Hire Statement Recap is attached hereto as Exhibit 3.

13.    Atlas' claim for reimbursement for the hire paid in advance, but not used, covering the period of February 23, 2008, 16:58 hours to March 5, 2008, 05:00 hours is included

3

in Atlas' Hire Statement Recap (Exhibit 3) which reflects a total outstanding balance due to Atlas in the amount of $656,338.51.

14.    In addition, Atlas' payment of hire for the period of February 20, 2008, 16:42 hours to February 23, 2008 16:58 hours became valueless to Atlas because the Vessel was withdrawn from Atlas' services. Thus, the hire covering this period of 3.01 days, equal to $123,123.09, together with expenses for bunkers ($9,771.65) covering the ballast voyage from Mobile to Southwest Pass, for a total of $132,894.74, also is due to Atlas from Shipping-Land as a result of its breach of the Time Charter and Addendum No.1.

15.    Atlas also is entitled to damages for the estimated loss it incurred because the Vessel was not at Atlas' disposal until May 20, 2008 in accordance with the terms of Addendum No.1. The estimated profit for the unperformed voyage is $509,308.00. A true and correct copy of the unperformed voyage calculation is attached hereto as Exhibit 4. However, in order to position the vessel to perform this voyage, as discussed above, a positioning voyage was required. The estimated cost for the positioning voyage is $196,900.89. A true and correct copy of the calculation of the cost of the positioning voyage is attached hereto as Exhibit 5. Therefore, Atlas is also entitled to recover $312,407.11 (estimated profit from the unperformed voyage minus Atlas' estimated costs for the positioning voyage) from Shipping-Land because the Vessel was not at Atlas' disposal until May 20, 2008.

16.    Based on the preceding, Atlas' total claim in principal amount against Shipping-Land as best as can be presently estimated is US $1,110,640.36.

17.    On or about February 29, 2008, Atlas requested payment from Shipping-Land for damages suffered as result of Shipping-Land's breach of the Time Charter and Addendum No. 1, which Shipping-Land has not paid.

18.    The terms of the Time Charter call for the application of English law and London arbitration. While all disputes arising out of the Time Charter are to be arbitrated in London, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well as 9 U.S.C. §8, and is not and cannot be considered a waiver of the Time Charter's arbitration clause.

19.    Interest, costs and attorneys' fees routinely are awarded to the prevailing party in London arbitration proceedings.

20.    Upon information and belief, it will take at least two years to arbitrate this dispute to conclusion, resulting in the following estimated interest and attorneys' fees and costs as well as the principal claim:

| | |
|---|---|
| Interest (6% on $1,110,640.36 from February 23, 2008 through March 7, 2010): | $   135,650.27 |
| Attorneys' fees: | $   175,000.00 |
| Costs: | $     25,000.00 |
| Total Principal Claim: | $ 1,110,640.36 |
| Total Sought: | **$1,446,290.63** |

21.    Shipping-Land is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of Shipping-Land Co. Ltd. with, upon information and belief, the following financial institutions:

ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York; Bank of Tokyo-Mitsubishi UFJ Ltd.; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.    That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Shipping-Land Co. Ltd. with the financial institutions noted above in paragraph 21;

2.    That Shipping-Land Co. Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.    That this court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court.

4.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof.

5.    That this Court award Plaintiff its attorney's fees and costs of this action; and,

6

6.    That this Court grant Atlas Shipping A/S such other and further relief which it may deem just and proper.

Dated: New York, New York
       March 7, 2008

HOLLAND & KNIGHT LLP

By:

James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007-3189
(212) 513-3200
Telefax:  (212) 385-9010
E-mail:  jim.hohenstein@hklaw.com
         lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
*Atlas Shipping A/S*

# VERIFICATION

STATE OF NEW YORK       )

                                  :ss.:

COUNTY OF NEW YORK      )

LISSA D. SCHAUPP, being duly sworn, deposes and says:

I am associated with the firm of Holland & Knight LLP, counsel for Atlas Shipping A/S ("Plaintiff"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff's representatives regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to an officer or director of Plaintiff is that there are none within the jurisdiction of this Honorable Court.

_____
Lissa D. Schaupp

Sworn to before me this
7th day of March, 2008

_____
Notary Public

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 20__

# 5173143_v1

# EXHIBIT 1

# Time Charter

### GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in *Athens*..............................*19th*.... day of *September 2007* ......... ~~19~~...
2  Between *Shipping-Land Co. Ltd., Seoul - Korea*.....................................**as disponent**...............................................................
3  Owners of the good *Panama flag*..................... ~~Steamship/~~Motorship " *IKAN MANZANILLO* " *- See Description Clause 29 of* ..............
4  of ...................... tons gross register, and ...................... tons net register, ~~having engines of~~ ...................... ~~indicated horse power~~
5  and with hull, machinery and equipment in a thoroughly efficient state, ~~and~~ classed *ABS*
6  at ...................... of about *41696.4/40253.8* cubic feet *metres grain/*bale capacity, and about *34,062 metric*...... tons ~~of 2240 lbs.~~
7  deadweight capacity (cargo and bunkers, including ~~fresh water and~~ stores not exceeding *280 metric tons excluding fresh water)* ~~one-and-one-half percent~~
~~of ship's deadweight capacity,~~
8  allowing ~~a minimum of fifty tons)~~ on a draft of *10.776*.......... ~~feet~~ *metres* ........ ~~inches~~ on *salt*................. Summer freeboard, inclusive of permanent bunkers,
9  ~~which are of the capacity of about~~.............................. ~~tons of fuel,~~ and capable of steaming, fully laden, under good weather
10  conditions about *13.5* .... knots on a consumption of about *27 metric* tons of *Intermediate fuel oil 180 cst plus about 2.0 metric tons of marine
diesel oil at sea* ~~best Welsh coal - best grade fuel oil - best grade Diesel oil,~~
11  now ..............................................................................................................................................................................................
12  .............................................. and *Atlas Shipping A/S* ................................................, Charterers of the City of *Copenhagen, Denmark*

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  ~~about~~ *a period employment of minimum 3/maximum 5 months time charter.*..............................................................................
15  .................................................................................................................................. within below mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations
hereunder.*
18  Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping last outward sea pilot safe port Savannah, Georgia / Portland, Maine
19  range, port in Owners' option, at any time, day or night, Sundays and holidays included* ~~in~~
20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be
22  ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the *ordinary cargo* service, having water ballast, ~~winches
and~~
23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen *as per regulations* for a vessel of her tonnage), to be employed, in carrying lawful
merchan-
25  dise, ~~including petroleum or its products, in proper containers,~~ excluding *See Clause 51.*
26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29  ~~Mexico, and/or South America~~...................................................................................................................................... ~~and/or Europe~~
30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32  *Trading Exclusions - See Clause 52* .......................................................................................................................................
33  ..............................................................................................................................................................................................
34  ..............................................................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:
36  1.    That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including *drinking water, lubricating oil and garbage
dues, if not compulsory,* boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection certificates necessary to comply with current
requirements at ports of call and canals* for and during the service.
39  2.    That the Charterers shall provide and pay for all the *fuel and marine diesel oil* except as otherwise stated, Port Charges, *River Tolls,
Towage, Canal Dues, following* Pilotages *to be for Charterers' account: Dardanelles / Canakkale - Great Belt / Skaw - Magellan
Straits and compulsory pilotages, Boatage on Charterers' business,* Agencies *for clearance and cargo purposes only,* Commissions,
40  Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried *and/or cargoes intended to be carried* or ports visited while
vessel is employed *including crew accomodation ashore if required* under this
43  charter to be for Charterers account - *as per Clause 62.* ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous
period~~
44  ~~of six months or more.~~
45     Charterers are to provide necessary dunnage ~~and shifting boards,~~ also any extra fittings requisite for a special trade or unusual cargo, but

46    Owners to allow them the use of any dunnage, *lashing materials on board* and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47    for dunnage, they making good any damage thereto.

48    3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49    board the vessel, ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~ ...............................tons and not more than

50    .......................~~tons and to be re-delivered with not less than~~ ..................................~~tons and not more than~~ ................tons. *See Clause 61.*

51    4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 43,000 per day including overtime payable 15*

52    *days in advance* ..................................................... ~~United States Currency, per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53    ~~stores, on~~.............................................................. ~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54    and after the same rate for any part of a month *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55    wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port Boston/Bahia Blanca range or in*

56    *Charterers' option Murmansk/Capetown range including Baltic, UK/Eire, full Mediterranean/North coast Africa, Adriatic and*

    *Black Sea within trading areas, port in Charterers' option, at any time, day or night, Sundays and holidays included* unless

    otherwise mutually agreed. Charterers are to give Owners not less than *25 days approximate*

57    notice, *all going well except unforeseen circumstances including but not limited to change of berthing turns at port of discharge*

    of vessels expected date of re-delivery, and probable port *and 20/15/10/5 days approximate and 3/1 days definite redelivery notice including*

    *port area.*

58    5.   Payment of said hire to be made in New York *(See Clause 100)* in cash in United States Currency, ~~semi-monthly~~ *every 15 (fifteen) days* in

    advance, and for the last ~~half-month~~ *15 (fifteen) days* or

59    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance ~~day-by-day~~ *up to latest expected*

    *redelivery time/date as advised to Owners by Charterers,* as it becomes

60    due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63    ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64    ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain *subject to Owners' prior approval,* by the

    Charterers or their Agents, subject

66    to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67    of such advances.

68    6.   That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe anchorage* place that Charterers or their

    Agents may

69    direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in Argentina ports and South Brazil ports and at*

    *Buenaventura* where it is customary for similar size vessels to safely

70    lie aground.

71    7.   That the whole reach of the Vessel's Hold, Decks, *as per Clause 88* and usual places of loading (not more than she can reasonably stow and carry),

    also

72    accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73    tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74    ~~paying Owners~~ ...........................................~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75    ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*

76    8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77    boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78    agency; and Charterers are to load, stow, and trim, *secure, tally/weigh/dunnage, lash, unlash, relash and discharge* the cargo at their expense

    under the supervision of the Captain, who is to sign Bills of Lading for

79    cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80    9.   That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81    receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82    10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel, *provided sufficient lifeboat capacity*

    *available* and see that voyages are prosecuted

83    with the utmost despatch. *(It is understood that supercargo attends the vessel only whilst at loading or discharging port and not to*

    *travel on board whilst at sea).* He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84    rate of $10.00 per day *for victualling at Captain's table.* Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their

    Agents, to victual Tally

85    Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling.~~

86    11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87    Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88    terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89    sumption of fuel.

90    12.   That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation only.*

91    13.   ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ....................................................................

92    ........................................................................................................................................................................

93    ~~on giving written notice thereof to the Owners or their Agents~~ ..............................~~days previous to the expiration of the first named term, or any declared option.~~

94    14.   That if required by Charterers, time not to commence before *00:01 hours - 5th October 2007* ................................, and should vessel

95    not have given ~~written notice of readiness~~ *been delivered* on or before *24:00 hours - 25th October 2007* ~~but not later than 4 p.m.~~ Charterers or

96    their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners to narrow laydays to 10 (ten)*

*days spread latest 10 days prior first layday. Owners to give approximate notice of delivery on fixing  then 15/10/7 days approximate and 4/2/1 days definite notice of delivery.*

97     15. That in the event of the loss of time from deficiency *and/or default* of men *including strikes of the officers and crew whether due to labour dispute or otherwise or deficiency of men* or stores, fire, breakdown or damages to hull, machinery or equipment,
98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other *similar cause whatsoever*
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.
102     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107     17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~New York~~ *London,*
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *This charter party*
*shall be governed by English law. BIMCO Standard Law and Arbitration Clause (London Arbitration/English Law) are to apply.*

110     18. That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires* for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules~~ 1 to 15, inclusive, 17 to 22, inclusive,~~ and Rule F of
116 York-Antwerp Rules *1994 or any amendment thereto,* ~~1924, at such port or place in the United States~~ as may be selected by the carrier, and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of *London.* ~~New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126     ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~ *Charter hire not to contribute to General Average.*
132     Provisions as to General Average in accordance with the ~~above~~ *New Jason Clause* are to be included in all bills of lading issued hereunder.
133     20. Fuel used by the vessel while off hire, also ~~for cooking, condensing water, or~~ for grates and stoves to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners. *Bunkers consumed during off-hire to be for Owners' account.*
135     21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *No dry docking to be carried out during this charter except in case of emergency.* .............................................................
139 .................................................................................................................................................................
140     22. Owners shall maintain the gear of the ship as fitted, providing gear (for all ~~derricks~~ *cranes*) capable of handling lifts ~~up to three tons,~~ *as per Clause 29,* also
141 providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel ~~lanterns and oil~~ *sufficient lights as on board* for
143 night work *free of expense to Charterers.* ~~, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at~~
144 ~~Charterers' expense.~~ The
Charterers to have the use of any gear on board the vessel.
145     23. Vessel to work night and day, if required by Charterers, and all winches *cranes* to be at Charterers' disposal during loading and discharging. ~~:~~
146 ~~steamer to provide one winchmen per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen~~ *Shore cranemen* to be paid by Charterers. In the event of a disabled winch *crane*
or ~~winches~~ *cranes,* or
149 insufficient power to operate winches *cranes,* Owners to pay for shore engine, or engines, in lieu thereof *but in this case to remain on full hire provided full gangs can be workable otherwise pro rata,* if required, and pay any loss of time occasioned
150 thereby.
151     24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;~~

153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder.~~
155                                          U. S. A. Clause Paramount
156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160                                          Both to Blame Collision Clause
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss of liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167 25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel not to force ice or follow ice breakers.*
170 26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats, except in the case of strike of pilots/tugboats/linesmen,* insurance, crew, and all other
172 matters, same as when trading for their own account.
172 27.  A commission of ~~2 1/2~~ *1.25* per cent is payable by the Vessel and Owners to *Clarkson Hellas Ltd., Hellas*
173 ...........................................................................................................................................
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28.  An address commission of ~~2 1/2~~ *3.75* per cent payable to *Charterers* ..................................... on the hire earned and paid under this Charter.

*Clauses 29 to 119 inclusive as attached hereto, are deemed to be fully incorporated in this charter party.*

              *OWNERS*                                           *CHARTERERS*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 29 – Vessel's Description**
'Ikan Manzanillo' (ex maha avanti ex jin bi)
34,062 dwt on 10.776 m ssw
blt 83 panama flag
class abs
g/b 41696.4/40253.8 cbm
loa/beam 178/27 m
5 ho/ha 4 x 25 ton cranes
speed abt 14.0 kts ballast / 13.5 kts laden under good weather condition on abt 26 mt ballast / abt 27 mt laden ifo (180 cst rme25) plus abt 2.0 mt mdo at sea
in port consumptions : idle abt mdo 2.0mt
working 8 hrs abt mdo 2.7mt/24 hours abt mdo 4.0mt
speed/consumption are given on 'about' basis (meaning 5pct) under good weather conditions not exceeding beaufort wind scale 3 and douglas sea state code 3 and free of adverse currents.
vsl has liberty to burn mdo
when manoeuvring in canals, rivers, channels,
shallow/narrow/restricted waters, when starting engine and manoeuvring
in bad weather.
'all dets abt' except for bunker specs

**Clause 30 – War Risk Insurance**
Any extra insurance premium for trading PERSIAN GULF/ARABIAN GULF for Charterers' account against invoice from Owners' underwriters. Any additional premium for blocking/trapping plus crew war bonus to be for Charterers' account. Charterers to pay any additional premium should countries to which Charterers are trading require additional premium as declared by Owners' underwriters.

**Clause 31 – ISRAEL / YUGOSLAVIA Call and ARAB Blacklist**
The Owners guarantee that neither the vessel nor any other vessel owned, managed and controlled by them has ever traded to an ISRAELI port.

The Owners also guarantee that neither the vessel nor any other vessel Owned, managed and controlled by them is blacklisted by any ARAB country. The Owners also guarantee that neither they nor any vessel's Owned, operated or managed by them, including this vessel have any relationship or connection with YUGOSLAVIA, SERBIA, MONTENEGRO or any YUGOSLAVIAN, SERBIAN or MONTENEGRO interest.

**Clause 32 – Boycott**
Owners warrant that the vessel has not been blacklisted by government authorities or by any other organisation such as a bona fide union or suppliers in any of the countries to which she might trade in the course of this Charter Party.

In the event that vessel is delayed by strikes, lock outs, labour stoppage or any other difficulty due to flag or Ownership or management of the vessel or due to the terms and conditions under which members of the crew are employed, the hire shall cease for such time lost. Costs directly related to the vessel caused by such immobilization to be for Owners' account.

**Clause 33 – Grace Period**
Where there is any failure to make punctual and regular payment of hire, the Charterers shall be given by the Owners 3 (three) clear United States of America banking days written notice to rectify the failure and when so rectified within those 3 (three) days following Owners

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

notice, the payment shall stand as regular and punctual and the Owners will not withdraw the vessel.

### Clause 34 – Deratting Certificate
The vessel shall be delivered with valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of this Charter, costs of renewal of certificate and fumigation on the vessel, if necessary, shall be for Owners' account except if such fumigation required due to the cargoes carried and/or cargoes intended to be carried or ports visited under this Charter. Any detention and extra expenses incurred thereby shall be also for the Charterers' account.

### Clause 35 – Quarantine / Radio Pratique
Normal quarantine time and expenses for the vessel entering port shall be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness, etc., of Master, Officers and crew shall be for Owners' account.
Further, the vessel shall be in possession of valid certificate (it is agreed that we are talking only for deratting exemption and crew vaccination certificate) necessary to prepare Radio Pratique at port or ports where Radio Pratique is available and accepted.

### Clause 36 – Health Certificate
The vessel shall be in possession of necessary certificates to comply with safety and health regulations and all current requirements at ports of call during this Charter. The Master, Officers and crew of the vessel hold valid vaccination certificates against yellow fever, cholera, etc.

### Clause 37 – Cargo Gear and Equipment
The vessel's cargo gear and all other equipment shall comply with the regulations and/or requirements in effect at port or ports of call and canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of valid and up-to-date certificate on board to comply with such regulations and/or requirements.

A particular reference is made to the U.S. Department of Labour Safety and Health Regulations set forth in Part III Code of Federal Regulations and also all Australian Navigation (Loading and Unloading Safety Measures) Regulations 1961 or any amendments thereto and related requirements and recommendations.

If stevedores, longshoremen or other labourers are not permitted to work by reason of failure of the Master, Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid and up-to-date certificates, then the Owners shall make immediate corrective measures. The Charterers may suspend hire for time lost thereby and any extra expenses including stevedore standby time but only up to next subsequent shift shall be for Owners' account.

### Clause 38 – Weather Routing
Charterers may supply Oceanroutes advice to the Master during voyages specified by the Charterers. The Master to comply with the reporting procedures of the routing service selected by Charterers. The vessel shall be capable at all times during the currency of this Charter Party to maintain that speed and daily fuel consumption as specified in Clause 29 in good weather conditions. For the purpose of this Charter Party "good weather" conditions are to be taken as a wind speed not exceeding Beaufort Force 4. It is understood that vessel's shaft generator is working under "good weather" conditions.

2

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

Evidence of weather conditions to be taken from the vessel's deck logs and independent weather bureau reports.

In the event of a consistent discrepancy between the deck logs and independent bureau reports, then Owners to have the right to appoint their own weather routing company for investigating further and the common decision between Owners' weather routing company and Charterers' independent bureau reports to be taken as ruling.

### Clause 39 – Waterside Workers Federation (W.W.F.) / Hold Ladders

Owners guarantee that vessel is suitable for world wide trading including GUATEMALA / UNITED STATES OF AMERICA / SOUTH KOREA with Australian hold ladders/Waterside Workers Federation/International Transport Workers Federation (I.T.F.) in good order.

The vessel to be fitted and to be settled with Australian hold ladders on delivery and during the whole period of this Timecharter.

### Clause 40 – Stevedore Damage

Stevedores to be appointed and paid by the Charterers but to work under supervision of the Master. Should any damage be caused to the vessel or her fittings by the stevedores, the Master has to try to let stevedores repair such damage and try to settle the matter directly with them.

The Charterers shall not be responsible for any damage caused by stevedores to the vessel unless the Master (taking highest degree of care to obtain) obtains written acknowledgement of the damage and liability from the concerned stevedores and notifies the Charterers or their agents and the concerned stevedores and immediately notifies the Charterers or their agents of such damage within 24 (twenty four) hours from the occurrence except hidden damage which should be notified within 24 (twenty four) hours from when detected.

Stevedore damages affecting Class/seaworthiness/cargo gear worthiness and/or proper working of the ship to be repaired immediately on occurrence at Charterers' time and expense and in accordance with Class requirements.

Charterers can redeliver the vessel without repairing any stevedore damages incurred during the currency of the Charter Party, provided this does not affect Class/ seaworthiness/cargo gear worthiness and/or proper working of the ship, but Charterers undertake to reimburse Owners for actual expenses incurred on stevedore damage items as identified per on and off-hire survey reports against invoices issued by shipyard or workshop or Master's statement in case repair for such damages will be carried out by crew.

### Clause 41 – Protection and Indemnity Club

Owners confirm that the vessel shall be fully covered by a Protection and Indemnity Club which is a full member of the International Group of P&I Clubs during the currency of this Charter Party.

Owners' P & I Club    :    Reverting

The Charterers have the benefit of the Owners granted by the Protection and Indemnity Club as far as the rules permit.

3

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

Owners confirm that the vessel will carry on board throughout the Charter Party an original or certified copy of a normal P & I Certificate of Entry.

### Clause 42 – Interclub New York Produce Exchange Agreement
Liabilities for cargo claims shall be borne by the Owners and the Charterers in accordance with Interclub New York Produce Exchange Agreement in February, 1970 and its reprints of May, 1972 and May, 1984 and any subsequent modifications or replacement thereof.

### Clause 43 – Owners' Agents
The Owners shall appoint Owners' agents to attend, if necessary, Owners' matters such as General Average, dry docking, hospitalisation, repatriation of crew, repair, supply of the vessel's stores and provisions, etc. In case Owners are unable to arrange same, Charterers to agree to have their agents attend such matters with Owners paying actual expenses and agency fee according to Charterers' agents tariff. It is understood and agreed that Charterers' agents will attend Owners' minor affairs such as delivery of cash to Master, crew mail, transportation, etc., without charging agency fee, if tariff allows it, but Owners to reimburse actual outlays to Charterers against supporting vouchers.

### Clause 44 – Deductions
Charterers are entitled to deduct value of redelivery bunkers from last sufficient hire payments. Charterers also have the right to deduct from hire payments any case advances to vessel and estimated Owners' disbursements at ports of call up to a maximum of US$ 500 (five hundred United States dollars) per port. Charterers to forward supporting documents as soon as possible. Owners' prior approval is to be obtained if Charterers wish to deduct more than US$ 500 (five hundred United States dollars) from hire for any port.

### Clause 45 – On- / Off-Hire Survey
On-/off-hire survey both ends to be a full bunker and condition survey which to be performed at each end by an independent surveyor with costs split 50/50 between Owners and Charterers.

Time for on-hire survey to be in Owners' time if the same interferes with vessel's operation and time for off-hire survey to in Charterers' time.

### Clause 46 – Replenishment of Bunkers
Replenishment of bunkers is arranged and paid for by the Charterers but always under the supervision and responsibility of the Master. The Master shall pay due diligence for replenishment of bunkers so as not to cause oil spillage while bunkering.

### Clause 47 – Oil Pollution
Owners warrant that throughout the currency of this Charter, they will provide the vessel with the following certificates: either the certificate issued pursuant to Section 311 (P) of the U.S. Federal Water Pollution Control Act, amended (Title 33 U.S. Code, Section 1321 (P)) or, the certificates issued pursuant to Section 1016 (A) of the Oil Pollution Act 1990, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR so long as these can be obtained by Owners.

### Clause 48 – Deviation / Put Back
Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel, or dry docking or periodical survey, or deviates from the course of the voyage caused by sickness of or accident to the Master,

4

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

Officers, crew or any person on board the vessel other than persons travelling by the Charterers' request or by reason of sending stowaway or refugee, salvage including saving life or by reason of the refusal of the Master, Officers or crew to do their duties, or any Owners' matters, the payment of hire shall be suspended from the time of inefficiency in port or at sea until the vessel is again efficient in the same position or regain a point of progress equivalent but no less favourable to Charterers to that at which the hire ceased hereunder. However, should the vessel resume her service from a position nearer to Charterers' next loading/ delivery point, Charterers shall reimburse Owners for actual time/bunkers saved.

Bunkers consumed while the vessel is off-hire and all extra direct expenses incurred during such period shall be for Owners' account.

### Clause 49 – Capture, Seizure, Arrest
Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party the payment of hire shall be suspended until the time of her release, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents.  Any extra expenses incurred by and/or during the above capture, seizure or detention or arrest shall be for Owners' account.

### Clause 50 – Smuggling
Any delay, expenses and/or fines incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

### Clause 51 – Cargo Exclusions
The vessel shall be employed in carrying lawful merchandise always as per IMO/ IMDG regulations and in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment and discharge and of any intermediate countries or ports through whose waters the vessel must pass always excluding any cargoes, goods or commodities of a dangerous, injurious, explosive, hazardous, flammable, self-combustible or corrosive nature as listed in the latest IMO DG Code and/or any subsequent modifications/ amendments thereof, and always specifically excluding the following cargoes:

All deck cargoes except as per Clause 88, acids, ammonium nitrate and ammonium sulphate (except for harmless fertiliser grade which is permitted), ammunition, animal meal, arms, asbestos or its products, ashes, asphalt, bitumen, black powder, bone ash and bone meal, bones, borax, calcium carbide, calcium chloride, calcium hypochlorite, calcium hydrochloride, calcium hydroxide, calcium oxychloride, caustic soda, cement, charcoal, concentrates (except lead, zinc and copper which are permitted), containers, copra and its products, cotton and cotton waste, creosoted goods, contraband, dangerous chemicals, direct reduced iron, drugs, expellers, explosives of any kind or nature (including blasting caps, bombs, detonators, T.N.T. and dynamite), ferro silicon, fishmeal, fuels, hides, hot briquetted iron, livestock of any description, logs, mahogany, manioc and manioc pellets, meals, meat bone meal, metal cuttings/turnings/shavings/borings, motor blocks, motor spirit, naphtha, nitrates, nuclear and/or radioactive cargo/waste/material/substances or their products, nuclear fuels, nuclear isotopes, palm kernels and palm kernel expellers, petroleum and all its products, by-products and derivatives, pitch in bulk, pencil pitch, petroleum coke (except as below), pyrites, pond coal, resin, all rice in bags and/or bulk (except for bulk rough/brown paddy rice which is permitted), sunflowerseeds expellers and cakes, sponge iron, swarf, slurry, sludge,

5

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

sulphur, all salt except for bulk rock or solar salt  (see below), saltpetre, shavings, sheepskin, sodium sulphate, tar and its products, turnings, turpentine, war materials, waste paper, wastes, zinc, zinc ashes and cement clinker.

All cargoes to be prepared/loaded/stowed/carried and discharged strictly in accordance with IMO and local regulations. Any and all extra measures, precautions, fittings, cleaning (before loading and/or after discharging) required for any special cargo carried, to be performed at Charterers' time, risk, expense and sole responsibility, crew providing their utmost assistance, to Master's and/or Class Surveyor satisfaction.

Concentrates (lead, zinc and/or copper only) are to be loaded, stowed, carried and discharged in accordance with IMO and local/coastguard regulations.

Before commencement of loading Charterers/shippers to provide Master with laboratory analysis/certificate evidencing that both the flow moisture point and transportable moisture limit of such cargo are within the limit as set out by IMO.  After loading Charterers to undertake to arrange for special extra trimming and/or levelling of the cargo to satisfaction of Master and independent surveyors appointed by Charterers/shippers at their expense and time.

Any directly related extra expenses resulting therefrom/incurred thereby (such as hold cleaning to Master's satisfaction/hold survey etc.) and any detention through any of above causes to be for Charterers' account.

Where so required when carrying agricultural products/oilcakes/seeds and other such cargoes, Charterers to issue certificate by competent authorities for carriage stating the oil and moisture content of and to provide mutually agreed monitoring equipment for the voyage.

No bagged cargoes to be carried to AQABA or WEST AFRICA.

Notwithstanding the above, it is specifically agreed that Charterers may load maximum 6 (six) voyages during this Charter Party out of the following cargoes – shredded and/or HMS 1 and 2 scrap (always excluding motor blocks and turnings), pig iron, cement clinker, bulk rock or solar salt and raw green delayed/calcined petroleum coke, but these may not be loaded as the last cargo prior redelivery.  It is further agreed that Charterers may load maximum 2 (two) cargoes of aggregates during this Charter Party. The vessel is not to be employed in more than 2 (two) consecutive short haul trades with cargoes stowing less than 40 (forty) cubic feet per metric ton without Owners' prior approval. Charterers are allowed to load 2 dirty cargoes out of cement/clinker/petcoke/scrap/salt which not to be the last cargo.

Scrap Clause
Charterers are not allowed to load scrap in LIVERPOOL, UNITED KINGDOM.  For loading elsewhere, when loading shredded and/or HMS 1 and 2 scrap (always excluding motor blocks and turnings), Charterers undertake that loading of first layer of scrap not to be released until touching tanktop and not to be dumped/dropped during loading.  First layer of scrap to be loaded at height and to be evenly stowed/ trimmed to satisfaction of Master before loading balance of cargo.  Prior to loading shredded scrap, hold condition survey to be conducted by an independent surveyor appointed by Charterers in Charterers' time and costs split 50/50 between Charterers and Owners, and same to be done immediately after completion of discharge.  In case of any damage to the vessels Australian hold ladders and any other parts/places of the vessel caused by loading such scrap cargo (except for damage to hold plate which to be considered fair wear and tear), Charterers to be responsible for upgrading/repairs

6

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

to bring Australian hold ladders and other parts/places to same condition as prior to loading scrap before commencement of next voyage in case needed and/or other convenient place in case such damages are agreed by class surveyor not to be harmful for vessel's seaworthiness and safety, but in this case Owners are to be held harmless for any delays/expenses/costs to the vessel applicable to any delay in this repair.

It is expressly forbidden to load scrap in LIVERPOOL as the loading practices of the port are unacceptable.

Pig Iron Clause
Charterers are not allowed to load pig iron in PONTA DE MADEIRA, BRAZIL. When loading pig iron, Charterers undertake to use holds as few as possible, provided vessels stability and strengths permitting. Charterers undertake that loading first layer of pig iron not to be released until touching tanktop and not to be dumped/dropped during loading, so as to provide a cushion flooring for the balance of cargo under the Master's supervision and his reasonable satisfaction. In case during en route from loading to discharging port, cargo found to shift which may affect the seaworthiness or safety of the vessel, Owners have the right to call at nearest port for necessary cargo trim, all time/expenses incurred to be for Charterers' account and vessel to remain on hire for period. Pig iron from PONTA DE MADEIRA is expressly excluded from carriage.

Petroleum Coke Clause
When loading petroleum coke, it is only limited to the type of non-hazardous, non-dangerous green delayed type, metallurgical or calcined type. If Charterers exercise such option, Charterers undertake to use holds as less as possible, provided vessels stability/trim and stress permit. Such cargo to be loaded, stowed, trimmed, discharged strictly in accordance to latest IMO and/or any other latest regulations/rules applicable to such cargo. Should any additional/special wash down of holds before loading be reasonable recommended proposed required by Master, Charterers undertake to arrange the same at their time/expenses. After discharge Charterers to arrange at their expense/time of any additional/special wash down of holds carrying such cargo by chemical as Master reasonably considers it necessary. Any directly related extra expenses resulting therefrom/incurred thereby (such as hold cleaning to Master's satisfaction/hold survey etc.) and any detention through any of the above causes to be for Charterers' account.

Salt Clause
In case of loading bulk salt, it is agreed that Charterers will at their time and at their expense supply vessel with lime provided and lime wash holds intended for the loading of bulk salt to the satisfaction of the Master and approval of local Surveyors. If required by Charterers such lime washing to be performed by vessel's crew providing local port and labour regulations permit. In case lime washing is performed at sea, same to be done weather permitting and provided steaming time, from last discharge port to the load port, is sufficient for the crew to perform such lime washing. Charterers to pay Owners US$ 500 (five hundred United States dollars) per hold lime washed and in all cases lime to be supplied and paid for by the Charterers and vessel to remain always on hire.

Excluding all cargoes that require $CO_2$ in holds as vessel is not $CO_2$ fitted in holds.

7

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

No plywood and/or seasoned timber to be carried from/to UNITED STATES OF AMERICA ports.

However iron ore (including iron ore concentrates/pellets/lumps/fines) in bulk to be permitted but always excluding direct reduced iron/direct reduced iron products/hot briquetted iron).

Notwithstanding the above Charterers may load maximum 1 (one) cargo of cement in bulk during the Charter Party except in last 3 (three) months prior to redelivery.

Cement Protective Clause
Charterers to wash/clean all holds by fresh water after completion of discharge and to thoroughly remove residues and cement dust in holds or on deck at Charterers' time and expense. If cement holes are not available or not in the right positions, Charterers have the option to cut holes in vessels hatchcovers in connection with loading cement and re-weld same after completion of loading. The cutting and re-welding of holes is to be done to Class and Master's satisfaction in Charterers' time and expense.

**Clause 52 – Trading Exclusions**
The vessel is not to trade to any countries/areas which may from time to time be excluded by the authority of the vessel's flag.  Trading is to be via safe port(s), safe berth(s), safe anchorage(s), always afloat (Charterers' option not always afloat but safely aground at RIVER PLATE, SOUTH BRAZIL and BUENAVENTURA as per New York Produce Exchange 1946 Clause 6 wording) and always within Institute Warranty Limits excluding FINLAND, ISRAEL, TURKISH occupied CYPRUS, ALBANIA, YUGOSLAVIA and former YUGOSLAV territories (except for SLOVENIA and CROATIA which are permitted), LEBANON, SYRIA, LIBYA (including GULF OF SIDRA/SIRTE), ABKHAZIA, GEORGIA, SEA OF AZOV (except between 10th May and 10th November when allowed), RUSSIAN FAR EAST, NORTH KOREA, CAMBODIA, LAOS, IRAQ, SOMALIA, OMAN, ETHIOPIA, ERITREA, YEMEN, SUDAN, CUBA, HAITI, AMAZON RIVER, LIBERIA, ZAIRE, GUINEA BISSAU, DEMOCRATIC REPUBLIC OF CONGO, SIERRA LEONE, ANGOLA (including CABINDA), MAURITANIA and any countries with war or warlike situations, where any additional premium would be levied by Owners' underwriters or any places and/or territories under United Nations sanctions are either presently in force or subsequently imposed.  No trading in ice ports/zones/areas and vessel is not to force ice or follow an icebreaker.  Vessel not to trade directly between TAIWAN and CHINA or vice versa, nor trade to ST. LAWRENCE/GREAT LAKES above MONTREAL, to ORINOCO RIVER above MATANZAS, to MISSISSIPPI RIVER above BATON ROUGE nor PARANA RIVER above SAN LORENZO during the currency of this Charter Party. NIGERIA allowed with bulk cargoes only.

However INDIA, SINGAPORE, PEOPLE'S REPUBLIC OF CHINA always to be permitted.

8

### RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 52 – continued**

JAPAN is fully excluded, Charterers' option to trade full JAPAN but in the event that the JAPANESE or UNITED STATES OF AMERICA or CANADIAN or AUSTRALIAN authorities determine that the port is 'at risk' of Asian gypsy moth, then Charterers will arrange for the vessel to be issued with a Phyto-Sanitary Certificate prior to sailing last such JAPANESE port.

**Clause 53 – Gangway Watchmen**

Compulsory or shore watchmen arranged/ordered by Charterers or their agents to be for Charterers' account but if required by Master/vessel in writing to be for Owners' account.

**Clause 54 – Hold Condition on Delivery / Redelivery**

Vessel's holds on arrival at first load port to be clean swept, washed, dry and free of loose rust/residue of previous cargo to satisfaction/approval of official surveyors to load any permitted cargo. Failing same, vessel to be off-hire from the moment she is found dirty and not acceptable for loading until she is ready, clean and accepted to load. Also all directly related expenses due to such failure to be on Owners' account.

Charterers to pay Owners a lumpsum of US$ 4,500 (four thousand five hundred United States dollars) in lieu of hold cleaning on redelivery including disposal/ removal of dunnage/lashing/lime materials/debris/etc. provided same is not required compulsory, to shore. If port or other regulations require disposal and removal as above, compulsory, same is to be done at Charterers' time and expense.

In the event that Charterers are allowed by local authorities to leave dunnage on the vessel on redelivery and elect to do so, then the dunnage is to be removed from vessel's holds at Charterers' time and expense and left on deck where so directed by Master.

**Clause 55 – Preparation for Loading / Discharging**

Opening and closing of all hatchcovers shall be performed by the Officers and crew, unless prohibited by port and local and union regulations, in addition to usual operations performed by them. Opening/closing to be free of charges.

The Owners and the Master to undertake best efforts to co-operate with the Charterers for the best stowage of cargo.

**Clause 56 – Paramount Clause**

Clause Paramount, U.S. Clause Paramount, Canadian Clause Paramount, wherever applicable, or any national legislation or convention as may mandatorily apply to the Bill(s) of Lading issued hereunder, shall be deemed to form part of this Charter Party.

9

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 56 – continued**

War Risks Clause for Time Charters, 1993 (Code Name: CONWARTIME 1993)

1.  For the purpose of this Clause, the words:

    (a) "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master; and

    (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.  The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.  The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerent's right of search and/or confiscation.

4.  (a) The Owners may effect war risks insurance in respect of Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks) and the premiums and/or calls therefore shall be for their account.

    (b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

10

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 56 – continued**

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:

    (a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

    (b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

    (c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

    (d) to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

    (e) to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7. If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging port, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8. If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

11

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 57 – War Cancellation**

If major war breaks out between any two or more of the following countries: UNITED KINGDOM, UNITED STATES OF AMERICA, RUSSIA, THE PEOPLE'S REPUBLIC OF CHINA, JAPAN directly affecting the performance of this Charter, both the Owners and the Charterers shall have the option of cancelling this Charter whereupon the Charterers shall redeliver the vessel to the Owners, if she has cargo on board after discharge thereof at destination, or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by the Charterers. In all cases, hire shall be paid until the vessel's redelivery.

**Clause 58 – Dry Docking**

No dry docking to be carried out during this Charter unless in case of emergency.

**Clause 59 – Winch Trouble**

In the event of a breakdown of a winch/crane or winches/cranes by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency in relation to the number of hatches available. Any extra cost related to vessel incurred by such winch/crane trouble to be for Owners' account.

**Clause 60 – Bill(s) of Lading Signature**

Notwithstanding the provision of Clause 8, Owners/Master to authorise Charterers or their agents to sign original Bill(s) of Lading if required by Charterers, always in accordance with Mate's and/or Tally Clerk's receipts.

Charterers to indemnify Owners and keep them harmless of any and all consequences/ damages/expenses which may arise in case of any discrepancies between Bill(s) of Lading signed by the Charterers or their agents or by the Master at their request.

If required by Charterers, Charterers, or in Charterers' option, Charterers' agents will be authorised by Master to issue Bill(s) of Lading in conformity with Mate's receipts.

In case the Charterers need and require 1 of 3 original Bill(s) of Lading to be carried on board, same to be allowed by Owners/Master but only allowed after the Receiver, as named in the Bill of Lading, arrives on board the vessel at discharge port and endorses the Bill of Lading before discharge commences.

Bill of lading to be marked "One original Bill of Lading retained on board against which Bill delivery of cargo may properly be made on instructions received from shippers/Charterers".

**Clause 61 – Bunkers**

Vessel to be delivered with bunkers as on board which estimated to be about 240 metric tons of intermediate fuel oil and about 60/80 metric tons of marine diesel oil.

12

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 61 – continued**

Bunkers on redelivery to be about the same quantities as actually on board on delivery.

Prices of bunkers at both ends to be US$ 350 per metric ton for intermediate fuel oil and US$ 600 per metric ton for marine diesel oil.

Charterers to pay for value of bunkers on delivery together with first hire payment and may deduct value of bunkers on redelivery from last sufficient hire payment.

**Clause 62**

Charterers have the option to fumigate the vessel's cargo compartments during this Charter Party at their own time and expense. The Master will be properly instructed by fumigation service as to the required procedures and he is to follow all such directions diligently. Provided that the type of fumigant to be used does not require the crew to vacate the vessel under local authority regulations, Owners warrant that the crew will remain on board. In the event that the fumigant does require the crew to leave the vessel under local authority regulations, all extra expenses including victualling and Officers/crew accommodation ashore is to be for Charterers' account.

**Clause 63 – Superficial Inspection**

The Charterers shall have the option of holding a superficial inspection prior to delivery and also at any time of this Charter. The Owners and Master shall give every facility and assistance which shall not be unreasonably withheld.

**Clause 64 – Hatch Waterproof Test**

Owners guarantee that vessel's hatchcovers are to be watertight all throughout this Charter period and if any hatchcover found defective, same to be rectified at Owners' time and expense to Class surveyor's satisfaction.

Charterers also have the right to carry out hose test on all hatches on delivery at their time and expense. Time and costs of survey to be for Charterers' account but the Master to give every facility to the Charterers and their surveyor to carry out such test.

**Clause 65 – Grab Discharging**

Owners guarantee that the tanktop is flag and suitable for grab discharge.

Charterers are allowed to use bulldozers/forklift in vessel's main holds subject to vessel's tanktop strength. Bulldozers/forklift to have rubber tyres/tracks.

Owners warrant that the vessel's cranes are in good working condition as per vessel's description including lifting capacity and speed of operation. In the event of non-compliance with the above, vessel to be off-hire pro rata.

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 65 – continued**

Bunkers consumed during off-hire period to be for owners' account and all directly related delays thereto and incidental expenses resulting from above to be for Owners' account, unless such breakdown, disablement, insufficiency or delay is caused by the act, neglect or omission of Charterers and/or their servants including but not limited to and in particular stevedores and/or winchmen/cranemen.  If shore crane(s) or grab(s) in lieu thereof are required by Charterers, same to be arranged by Charterers/their servants on Owners' account and hire to resume as soon as same are made available to the Charterers/their servants at load/discharge port(s).

Vessel's cranes are not combinable and Charterers may not use more than 1 (one) crane at any hold at one time.

**Clause 66 – Secrecy**

All negotiations and fixture to be strictly private and confidential, not to be reported to any third party and is not to feature in any fixture lists or market reports.

**Clause 67 – Return Insurance**

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their underwriters, as and when received from the underwriters, by reason of the vessel being in port for a minimum period of 30 (thirty) days if on full hire for this period or pro rata for the time actually on hire.

**Clause 68 – Off-Hire**

Should the vessel be placed off-hire more than 30 (thirty) consecutive days, the Charterers have the right to cancel the balance period of this Charter by giving notice to the Owners without prejudice to any right the Charterers may have under this Charter and provided no cargo on board.

**Clause 69 – Letter of Indemnity**

In the absence of original Bill(s) of Lading at discharge port(s), Owners/Master to allow cargo discharge against Charterers' Letter of Indemnity only, in Owners' standard Protection and Indemnity club wording but without bank endorsement/ guarantee.

**Clause 70**

Delivery/redelivery times to be based on local time.  However, for hire computation, Greenwich Mean Time to be used.

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 71**

New Jason Clause, Both-to-Blame Collision Clause, BIMCO Standard Law and Arbitration Clause 1998 (English Law – London Arbitration), Conwartime 1993, Chamber of Shipping Nuclear Clause to apply and form part of this Charter Party. All Bill(s) of Lading issued under this Charter shall incorporate the New Jason Clause, Both-to-Blame Collision Clause and Clause Paramount.

**Clause 72 – Tax**

All taxes and dues (except those levied by the country of vessel's flag) on the vessel and/or cargo and on Charter hire and freights arising out of cargoes carried or ports visited under this Charter Party shall be for Charterers' account.

**Clause 73 – Sea Carrier Initiative Agreement**

Charterers expect that Owners have put in place guidelines concerning drug and alcohol abuse, and applicable to the vessel performing under this Charter. These guidelines shall have the objective that no seafarer will navigate a vessel or operate its onboard equipment whilst impaired by the use of drugs or alcohol, and that no seafarer will have the possession of or the opportunity to sell, distribute, or transport illicit or non-prescribed drugs aboard the vessel.

Further, Charterers expect that the Owners shall exercise due diligence throughout the period of the contract to ensure that such guidelines are complied with on board.

Any delay or expense related to the vessel due to drug and alcohol abuse by Master/ Officers/crew to be for Owners' account.

**Clause 74 – Governing Law**

This Charter Party and any disputes arising hereunder shall be governed by and construed in accordance with English law both as regards substance and procedure.

**Clause 75 – Eligibility for Bunkering**

The Owners guarantee that the vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with U.S. Department of Commerce, Office of International Trade, Directive No. 705 and U.S. Coast Guard Regulations set forth in Title 33 Chapter 1, Part 155 Sub-Part C and 156 C and 156 Code of Federal Regulation. The Owners also guarantee that the vessel is eligible for bunkers in any other country.

**Clause 76 – Deleted**

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 77 – Change of Political Situation**

Should political, social and/or other situation change to the extent not to affect the vessel's trading to the excluded countries, the Charterers shall be allowed to make the vessel trade to such countries subject to the Owners' prior consent which shall not be unreasonably withheld.

**Clause 78 – PANAMA / SUEZ CANAL Transit**

The Owners guarantee that the vessel shall be fully fitted for PANAMA / SUEZ CANAL transit and in possession of valid necessary certificates during the currency of this Charter to comply with current regulations and requirements of both canals. Any surcharges to be levied by the Suez Canal Authority (SCA) on defective vessel according to their Circular No. 435156 shall be always for the Owners' account.

**Clause 79**

Vessel to supply at all times free of charge electricity/power to drive Charterers' grabs if shore power fails. This supply is subject to all wire/installation/cables to be supplied and installed and operated at Charterers' time/responsibility and expense. Charterers also to have free use of vessel's compressors as on board. If the vessels' power supply is not compatible with the grabs to be used then Charterers are to liaise with Master to see if he can assist but without responsibility to vessel/Owners.

**Clause 80 – Requisition**

Should the vessel be requisitioned by the government of the vessel's flag during the period of the Charter, the vessel shall be deemed to be off-hire during the period of such requisition and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. However, the Charterers shall have the option to cancel the balance period of this Charter.

**Clause 81 – Grain Loading Certificate**

The Owners guarantee that the vessel is a self-trimming bulk carrier and shall be suitable for carrying all kinds of grain in bulk without shifting boards, bagging or securing. The vessel shall have the latest grain loading certificate in compliance with IMO regulations on board.

**Clause 82 – Owners' Bank Details**

**Clause 83 –** Deleted

**Clause 84 – Intermediate Hold Cleaning**

If vessel is employed for more than 1 (one) laden leg, upon completion of discharge of each cargo, the crew are to thoroughly clean all cargo compartments in preparation for next cargo if required by Charterers. This cleaning work to be performed while vessel is in port upon completion of discharge or en route from last discharge port to the next loading port provided the time of the ballast leg is sufficient for work to be carried out or Charterers' right to stop the vessel at a safe place while crew carry out cleaning. The work to be done in the same efficient manner as if the vessel was trading for the Owners' account but without responsibility and prejudice to acceptance of vessel at loading port. Charterers to pay to the

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

Owners a lumpsum of US$ 500 (five hundred United States dollars) per hold for such work carried out including freshwater and materials, except after cement which to be US$ 1,000 (one thousand United States dollars) per hold, and after cement clinker, petroleum coke, salt and pig iron which to be US$ 700 (seven hundred United States dollars) per hold. It is understood that the work of cleaning of holds to be done as long as it is allowed by unions, local authorities and shore regulations.

**Clause 85 – BIMCO Double Banking Clause**

a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

d) The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.

e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

17

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 86 – Asian Gypsy Moth**

Owners confirm that vessel has not called COMMONWEALTH OF INDEPENDENT STATES PACIFIC ports under current Ownership although she die load in RUSSIAN PACIFIC November 2004 under previous Ownership. Owners are to be responsible for any delays or directly related expenses should vessel be found to have an Asian gypsy moth related problem. Furthermore, Owners guarantee that vessel meets all National Cargo Bureau/United States Department of Agriculture Plant Protection and Quarantine Office regulations.

**Clause 87**

Any PEOPLE'S REPUBLIC OF CHINA Tonnage Dues Certificate purchased by the Charterers is the property of the Charterers. Subject to Charterers' prior permission, Owners/future Charterers of the vessel may be permitted to use such certificate for subsequent employment at a cost of 50% of the original purchase price.

**Clause 88 – Deck Cargo Clause**

Charterers are to have full cargo rights on deck always within Master's discretion and in accordance with the Department of Trade and Industry or other equivalent authority regulations at loading port or ports. In the vent of any dispute arising in connection with deck cargo then vessel's Classification Society's ruling to be final as to seaworthiness and suitability. All uprights, lashing, etc., for deck cargo to be supplied by Charterers. Deck cargo always to be at Charterers'/shipper's risk and all Bill(s) of Lading issued for deck cargo to be claused in respect of such cargo "Carried on deck at shipper's risk without responsibility for loss or damage howsoever caused" or if from and/or to UNITED STATES OF AMERICA or its territories "Carried on deck at shipper's risk as to perils inherent in such carriage but in all other respects subject to the provisions of the U.S. Carriage of Goods by Sea Act 1936 or later equivalent legislation".

**Clause 89**

Vessel shall not trade in ice ports/zones/areas or force ice or follow ice breaker. If the Master considers it dangerous to remain at the loading, discharging or waiting place for fear of vessel being frozen in, he has the liberty to sail to a convenient open place and await Charterers' fresh instructions.

It is understood that the Master's decision shall follow shipping usual practice. Unforeseen detention through the above to be for Charterers' account.

**Clause 90**

Vessel has the liberty to use diesel oil while entering/leaving port(s), manoeuvring in shallow waters, canals, channels and rivers.

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 91**

The vessel is not to be ordered directly to/from TAIWAN after/prior calling MAINLAND CHINA as direct call(s) are prohibited by the countries involved and any consequences arisen therefrom to be at Charterers' risk and expense. If political situation changes, this treatment to be decided on the basis of mutual agreement between both parties.

**Clause 92**

Charterers to pay US$ 1,250 (one thousand two hundred and fifty United States dollars) per month or pro rata for covering all cable, communications, victualling, representation and entertainment expenses. No vouchers to be submitted.

**Clause 93**

Owners confirm vessel has valid certificates on board complying with current requirements for world wide trading.

**Clause 94 – Australia Quarantine and Inspection Service (A.Q.I.S.)**

Owners guarantee that the vessel's holds and deck to be suitable for loading/trading in AUSTRALIA in all respects. Also, Owners/vessel shall comply with A.Q.I.S. (Australia Quarantine and Inspection Service) requirements.

**Clause 95 – Deleted**

**Clause 96 – Documentation**

The Owners must fax Charterers copy of the vessel's Certificate of Registry and up-to-date Crew List as and when available when requested by the Charterers.

**Clause 97 – Deleted**

**Clause 98 – ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005**

(a) (i)   The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii)   Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 98 – continued**

    (iii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b) (i)  The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

> *"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

    (ii)  Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 99**

Owners guarantee that the vessel is suitable for AUSTRALIA / NEW ZEALAND calling.

**Clause 100**

First hire and value of bunkers on delivery to be paid within 3 (three) UNITED STATES OF AMERICA banking days after vessel's delivery and Charterers' receipt of original and signed Charter Party.

**RIDER CLAUSES TO M.V. "IKAN MANZANILLO"**
**CHARTER PARTY DATED 19TH SEPTEMBER 2007**

**Clause 101   – US Customs Advance Notification/**
**AMS Clause for Time Charter Parties**

(a) If the vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i)    Have in place a SCAC (Standard Carrier Alpha Code);
    ii)   Have in place an ICB (International Carrier Bond);
    iii)  Provide the Owners with a timely confirmation of i) and ii) above; and
    iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Clause 102   – BIMCO Bunker Fuel Sulphur Content Clause For Time Charter Parties**
**2005**

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

21

**RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
CHARTER PARTY DATED 19TH SEPTEMBER 2007**

**Clause 102 – continued**

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

  (i) The vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

  (ii) The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as but not limited to, the EU and the US Environmental Protection Agency.

**Clause 103 – Sea Waybill Clause**

Whenever Charterers issue Sea Waybill(s) instead of Bill(s) of Lading, such Sea Waybill(s) shall always be deemed to incorporate all the terms and conditions, liberties, clauses and exceptions of this Charter Party including the Law and Arbitration Clause, Paramount Clause, General Average Clause, New Jason Clause and Both-to-Blame Collision Clause.

Owners shall deliver the cargo to a party or parties nominated by Charterers as Consignee written in the Waybill.

**Clause 104 – BIMCO Standard ISM Clause for Voyage and Time Charter Parties**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

**Clause 105**

For total claims not exceeding US$ 50,000 (fifty thousand United States dollars) the Small Claims Procedure of the London Maritime Arbitrators' Association to apply.

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 106**

No Through, Transhipment or Combined Transport Bill(s) of Lading and no Waybill(s) are to be issued under this Charter Party.

**Clause 107**

Vessel to provide holdwise separations only. Any artificial separations to be done at Charterers' time/expense and risk in respect of any commingling and to be Master's satisfaction.

**Clause 108**

Charterers are to leave the vessel in a safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the Master's satisfaction for all shiftings between berths and all passages between ports under this Charter in their time and at their expense.

**Clause 109**

Charterers undertake that during the period of this Timecharter they will not procure any supplies, necessaries or services, including port expenses and bunkers on the credit of the Owners or in Owners' name but that these will always be procured in the name of the Charterers and shall always remain the responsibility of the Charterers unless Owners' prior consent.

**Clause 110** – Deleted

**Clause 111** – Deleted

**Clause 112**

Following standard Protective Clauses to be incorporated in full wording are part of this Charter Party:

U.S. Tax Reform 1986 Clause

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

U.S. Anti Drug Abuse Act 1986 Clause for Time Charters

a) Owners to be responsible for all consequences according to U.S. Anti Drub Abuse Act 1986, including detention of the vessel owing to illegal drug possession by ship's crew.

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
## CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 112 – continued**

b) Charterers to be responsible for all consequences, including detention of the vessel for infringement of U.S. Anti Drug Abuse Act 1986 by Charterers' supercargo and/or their agents and/or their servants and/or their employees (including stevedores) or for infringement arising out of the cargo.

c) In case the vessel or any other property belonging to the Owners be arrested for non-compliance with the U.S. Anti Drug Abuse Act 1986 for the reasons mentioned in above paragraph b) Charterers undertake to take immediate steps to provide bail to get the vessel or other arrested property released and to indemnify Owners for any loss (including loss of time) and expenses caused to Owners/ Master/crew.

U.S. Trade - Unique Bill of Lading Identifier Clause

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CFR Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

**Clause 113 – Hamburg Rules Charter Party Clause**

Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any Sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this Clause.

**Clause 114**

Owners' option to sell the vessel during this Charter Party. Charterers to have the right to approve Buyers and same not to be unreasonably withheld. If Charterers do not approve of the Buyers, Sellers (Owners) guarantee to fully perform the balance of the Charter as disponent Owners and to fulfil the Charter Party obligations.

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**Clause 115**

Owners guarantee that valid I.T.F. or equivalent agreement for the vessel covering any port or place is available on board for the whole Charter period.

**Clause 116**

Owners guarantee vessel not to be rejected at any port of call during Charter period by reason of trading with CUBA before and any time/expenses incurred thereby to be for Owners' account.

**Clause 117**

Hire shall not be due for any time lost by reason of any boycott or any blacklisted or any threat to boycott or blacklist of the vessel or vessel being rendered inoperative by strikes, labour stoppages or any other difficulties arising from the vessel's flag, nationality of her registry, her Ownership or management, the nationality of any member of her crew or the terms on which the crew are engaged or any other vessel under the same Ownership, management or control and Owners shall remain responsible for all consequential costs that may be incurred by Charterers.

Owners further guarantee, however, that the minimum terms and conditions on which the crew are engaged are now, or will be prior to the presentation of the vessel for delivery, covered by a bona fide trade union agreement acceptable to the I.T.F. and their local offices. If the vessel does not meet these requirements at any time during the currency of the Charter, the vessel is to go off-hire until such requirements are fully complied with, and any costs involved, including shore labour standby time, to be for Owners' account.

**Clause 118** – Deleted

**Clause 119** – Deleted


\* \* \* \* \* \* \* \* \* \*


## NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

## RIDER CLAUSES TO M.V. "IKAN MANZANILLO" CHARTER PARTY DATED 19TH SEPTEMBER 2007

**BOTH-TO-BLAME COLLISION CLAUSE**

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

\* \* \* \* \* \* \* \* \*

**NEW JASON CLAUSE**

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

The Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

\* \* \* \* \* \* \* \* \*

26

**RIDER CLAUSES TO M.V. "IKAN MANZANILLO"
CHARTER PARTY DATED 19TH SEPTEMBER 2007**

**CHAMBER OF SHIPPING NUCLEAR FUELS CLAUSE**

Notwithstanding any other provision contained in this Charter, it is agreed that nuclear fuels or radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusion does not apply to radioactive isotopes used or intended to be used for any industrial, commercial, agricultural, medial or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof.

\* \* \* \* \* \* \* \* \* \*

**U.S. SECURITY CLAUSE FOR TIME CHARTERING**

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

27

# EXHIBIT 2

**ADDENDUM NO.1**
**TO**
**MV IKAN MANZANILLO / ATLAS SHIPPING A/S**
**CHARTER PARTY DATED 19TH SEPTEMBER 2007**

It is this day 14th February 2008 mutually agreed between

**THE OWNERS MSSRS** "Shipping-Land Co. Ltd, Seoul-Korea"
**AND**
**THE CHARTERERS MSSRS** "Atlas Shipping A/S, Copenhagen, Denmark"

That in respect of the above Charter Party the following shall apply:-

"It is hereby agreed that charterers have been granted the option of exceeding the maximum period agreed in the charter party up to 20may 2008."

However, all other terms, conditions and exceptions of the above captioned charter party dated 19/09/2007 to remain unaltered and in full force.

Athens, 14th February 2008

| Owners | | Charterers |
|--------|--|-----------|
|        |  |           |

# EXHIBIT 3

Hire Statement Recap                                                                 Page 1 of 2

SHIPPING-LAND                                                                29 February 2008
c/o Clarkson Hellas Ltd
95, Akti Mialuli
Piraeus, 185 36
Greece

# Hire Statement Recap

**m.v. IKAN MANZANILLO - C/P 19 September 2008 - HF00416 Company Atl**

| | | | |
|---|---|---|---|
| Date of delivery: | 22-10-07 05:00 UTC | | |
| Date of redelivery: | 23-02-08 16:58 UTC | | |
| | | | |
| Total days on hire: | 124,498611 | | |
| Bunkerquantities mt: | IFO | MDO | MGO |
| Delivery: | 479,070 | 59,040 | 0,000 |
| Redelivery: | 430,733 | 66,450 | 0,000 |
| Bunkerprices USD: | | | |
| Delivery: | 385,00 | 700,00 | 0,00 |
| Redelivery: | 385,00 | 700,00 | 0,00 |

| | USD |
|---|---|
| **T/C Hire:** | |
| 22/10 05:00 hrs - 23/02 16:58 hrs UTC 124,498611 days at USD 43.000,00 | 5.353.440,28 |
| **Commissions deducted** | |
| 22/10 05:00 hrs - 23/02 16:58 hrs UTC 5% | (267.672,01) |
| **Bunkers on delivery** | |
| IFO 479,07 mts at USD 385 | 184.441,95 |
| MDO 59,04 mts at USD 700 | 41.328,00 |
| **Bunkers on redelivery** | |
| IFO 430,733 mts at USD 385 | (165.832,21) |
| MDO 66,45 mts at USD 700 | (46.515,00) |
| **Cables/Representation USD 1.250 /monthly** | 5.118,09 |
| **Charterers expenses** | |
| INT. HOLDCLEANING F01053 ISKENDERUN / BIK | 2.500,00 |
| INT. HOLDCLEANING F01053 | 2.500,00 |
| **In lieu of hold cleaning** | 4.500,00 |
| **Owners expenses** | |
| deduction for damages due to cleaning richards bay | (349.284,68) |
| O/E INV 0061-08 ISKENDERUN | (1.290,48) |
| **Payments** | |
| Charterers payment 22-10-07 | (807.688,15) |
| Charterers payment 06-11-07 | (644.816,39) |

Hire Statement Recap                                          Page 2 of 2


Charterers payment 21-11-07                                  (612.366,44)
Charterers payment 06-12-07                                  (615.866,44)
_____

Charterers payment 21-12-07                                  (613.366,44)
Charterers payment 04-01-08                                  (613.366,44)
Charterers payment 18-01-08                                  (613.366,44)
Charterers payment 04-02-08                                  (264.081,76)
Charterers payment 19-02-08                                  (612.075,96)
_____

**Balance in Charterers favour**                             (656.338,51)
_____


_____

**Estimated expenses**

est ctm on behlaf of owners                                  (1.000,00)
EST. O/E ALL PORTS                                           (8.000,00)
_____

**Total estimates** .                                        (9.000,00)
_____

                                                             E.& O.E.


Yours faithfully
Atlas Shipping A/S

Stine Bergholm Jensen

# EXHIBIT 4

Voyage Charter Calculation                                                          29. February 2008
Atlas Shipping A/S                                                                   Page    1
                                                                                             KBN

No. . . . . . . . . . . C31129                          Created  17-01-08 15:57    KBN
Vessel. . . . . . . . . IKAN MANZANILLO
Daily expenses . . . . 41.500,00              Speed      13,50      13,50
Charterers. . . . . . . Glencore Ag, Baar             Ballast     Laden    Port idle  Port work   Repl. Price
Employment . . . . . . port kaiser-grundartangi
                                                IFO     26,00      27,00    0,00       0,00       600,00
                                                MDO      2,00       2,00    2,00       4,00       800,00
                                                MGO      0,00       0,00    0,00       0,00       800,00

| Cargo No. | Commodity Name | Quantity | Freight rate (LCY) | Unit | Commissions | Loading rate | Unit | Discharge rate | Unit | Stevedoring Loading | Unit | Stevedoring Discharge | Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ALUMINA | 31.800,00 | 63,50 | Mt | 3,75 | 10.000,00 | Mt | 6.000,00 | Mt | 0,00 | Mt | 0,00 | Mt |

| Port | Port Code | B L | Distance | Speed | Days at sea | Extra days | Cargo No | L D | Quantity | I W | SHINC SHEX | Days in port | Extra days | Port expenses | Stevedoring |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROGRESO | BA | Ba | 0 | 13,50 | | | | | | Idl | 7 | | | 0,00 | 0,00 |
| PORT KAISER | LP | La | 704 | 13,50 | 2,17 | 0,50 | 1 | L | 31.500,00 | Idl | 1 | 3,15 | 0,50 | 20.000,00 | 0,00 |
| GRUNDARTANGI | DP | La | 3.736 | 13,50 | 11,53 | 2,00 | 1 | D | 31.500,00 | Idl | 1 | 5,25 | 0,50 | 65.000,00 | 0,00 |

Days at sea/port/total incl. extra days        19,20    8,40   25,60    Total   31.500,00 Mts.

| | | | | | | |
|---|---|---|---|---|---|---|
| Other income . . . . . | 0,00 | Gross freight . . . . . | 2.000.250,00 | Port expenses . . . . . | 85.000,00 | T/C equivalent. . . . . | 61.381,95 |
| Ballast bonus OUT . . | 0,00 | Fixed expenses . . . . | 0,00 | Stevedore expenses . | 0,00 | Break even . . . . . . . | 46,70 |
| Despatch . . . . . . . . | 0,00 | Net freight. . . . . . . | 1.925.240,63 | Bunker costs . . . . . | 256.376,51 | Daily result . . . . . . . | 19.591,95 |
| Miscellaneous. . . . . | 19.000,00 | Running costs. . . . . | 1.062.553,65 | Voyage result. . . . . | 509.307,97 | US$ 1.00 impact. . . . | 1.164,19 |

# EXHIBIT 5



